IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SHERYL MANOS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 11-1147 |
| v. | ) | |
| | ) | Chief Judge Gary L. Lancaster |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | Electronic Filing |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Gary L. Lancaster  
Chief Judge.                                                    May 11, 2012

### I.  INTRODUCTION

Sheryl Manos ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), seeking review of the final determination of the Commissioner of Social Security ("Defendant" or "Commissioner") denying her application for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401 – 433, 1381 – 1383f ("Act"). This matter comes before the court on cross motions for summary judgment. (ECF Nos. 8, 10). The record has been developed at the administrative level. For the following reasons, Plaintiff's Motion for Summary Judgment will be GRANTED, in part, and DENIED, in part, and Defendant's Motion for Summary Judgment will be DENIED.

## II. PROCEDURAL HISTORY

Plaintiff filed for DIB and SSI with the Social Security Administration on May 14, 2008, claiming an inability to work due to disability as of October 1, 2003. (R. at 83 – 95)[1]. Plaintiff was initially denied benefits on July 28, 2008. (R. at 57 – 65). A hearing was scheduled for January 19, 2010, and Plaintiff appeared to testify represented by counsel. (R. at 22 – 45). A vocational expert also testified. (R. at 22 – 45). The Administrative Law Judge ("ALJ") issued his decision denying benefits to Plaintiff on April 22, 2010. (R. at 12 – 21). Plaintiff filed a request for review of the ALJ's decision by the Appeals Council, which request was denied on July 7, 2011, thereby making the decision of the ALJ the final decision of the Commissioner. (R. at 1 – 3).

Plaintiff filed her Complaint in this court on September 16, 2001. (ECF No. 4). Defendant filed his Answer on December 8, 2011. (ECF No. 5). Cross motions for summary judgment followed. (ECF Nos. 8, 10).

## III. STATEMENT OF THE CASE

Plaintiff was born on November 16, 1957, and was fifty two years of age at the time of her administrative hearing. (R. at 27). Plaintiff graduated from high school, but had not post-secondary education. (R. at 27). She worked for approximately fifteen years as an office manager at a local marina. (R. at 28). Plaintiff was terminated from that position following a series of extended absences she attributed to psychological issues. (R. at 30, 146). She had not been employed since that time. (R. at 146). Plaintiff lived independently in her own home and

---

[1] Citations to ECF. Nos. 6 – 6-9, the Record, *hereinafter*, "R. at __."

was the primary caretaker for her young son. (R. at 32 – 35, 146). Plaintiff was capable of occasional driving, shopping, cleaning, and cooking. (R. at 32 – 35).

Plaintiff complained to be disabled as a result of depression, anxiety, and agoraphobia. (R. at 31 – 32). She felt that she was unable to deal with other people in a work environment. (R. at 29). Since her alleged date of disability onset, Plaintiff was treated only by her primary care physician, Christopher D. Olbrich, M.D. for her impairments. The record shows that Plaintiff had been seeking treatment with Dr. Olbrich as far back as June 2005. She continued to see him through January 2010. Plaintiff alleged that her failure to seek treatment with mental health specialists for her psychological issues – as opposed to seeing Dr. Olbrich, only – was the result of her distrust of, and discomfort with, other physicians. (R. at 30 – 32, 36 – 38).

Plaintiff's first visit with Dr. Olbrich on the record was in June 2005 following admission to the emergency department at Forbes Regional Hospital in Monroeville, Pennsylvania. (R. at 137). Dr. Olbrich reviewed the hospital's records which indicated that Plaintiff presented as very anxious and nervous, and was inebriated. (R. at 137). Dr. Olbrich informed Plaintiff that she needed to seek treatment for her alcohol use and psychological issues. (R. at 137). Plaintiff said that she would "think about it." (R. at 137). Dr. Olbrich provided a prescription for her anxiety. (R. at 137).

Plaintiff was not seen again until January 2006. (R. at 136). She was disheveled and smelled of alcohol. (R. at 136). She claimed that her drinking was not a problem. (R. at 136). She made no complaints regarding psychological issues, and none were noted. (R. at 136). At a visit in July 2006, Plaintiff's anxiety was noted to be a continuing issue, as was her alcohol consumption. (R. at 135).

On December 1, 2006, Plaintiff was involuntarily committed to the Western Psychiatric Institute and Clinic ("Western Psych") of Pittsburgh, Pennsylvania. (R. at 131 – 33). Plaintiff had been making suicidal statements to her nephew. (R. at 131 – 33). At that time, Plaintiff did not personally recall making such statements, but did endorse a history of suicidal ideation. (R. at 131 – 33). Plaintiff admitted to a severe drinking problem, and indicated that when extremely intoxicated, her suicidal ideation worsened. (R. at 131 – 33). She stated that she needed to "get off of the booze." (R. at 131 – 33). Plaintiff reported stress due to legal issues, as well as raising her son on her own. (R. at 131 – 33). Hospital staff reported that she was sad and dysphoric. (R. at 131 – 33). Plaintiff was released from Western Psych after approximately twelve to fourteen days of treatment. (R. at 37, 135).

Plaintiff did not return to Dr. Olbrich until May 2008 for complaints of depression. (R. at 138). At that time, Dr. Olbrich noted Plaintiff as suffering from depressive disorder, anxiety, agoraphobia with panic, bipolar affect, and alcohol dependence. (R. at 138, 141 – 42). Plaintiff was prescribed a number of medications for treatment of these issues. (R. at 139, 141 – 42). Plaintiff was noted to be doing a "little better." (R. at 142).

On June 16, 2008, Dr. Olbrich drafted a letter summarizing Plaintiff's treatment for her psychological issues. (R. at 174). He diagnosed Plaintiff with depression, anxiety, agoraphobia with panic, a history of alcohol dependence stemming from these disorders, and possible bipolar disorder. (R. at 174). He noted that Plaintiff was solely responsible for her son's upbringing. (R. at 174). Dr. Olbrich opined that Plaintiff had difficulty handling stress, had difficulty leaving her home, and had difficulty getting to the store. (R. at 174). Dr. Olbrich felt that Plaintiff's condition would not improve much in the near future, and that she would not likely be capable of working. (R. at 174).

4

On July 22, 2008, Plaintiff was examined by Ruth Ann Seilhamer, Ph.D. on behalf of the Bureau of Disability Determination. (R. at 144 – 55). Dr. Seilhamer diagnosed Plaintiff with bipolar disorder, panic disorder with agoraphobia, and alcohol dependence in sustained, full remission. (R. at 144 – 55). Following a mental status examination in conjunction with consideration of Plaintiff's subjective complaints, Dr. Seilhamer concluded that Plaintiff would have marked limitation interacting appropriately with the public, responding appropriately in a usual work setting, and responding appropriately to changes in a routine work setting. (R. at 144 – 55). Plaintiff was otherwise only moderately or not significantly limited. (R. at 144 – 55).

In her narrative report, Dr. Seilhamer observed that Plaintiff arrived promptly for her examination, drove unaccompanied, was clean, well-groomed, and neatly dressed, had good posture, made good eye-contact, did not exhibit bizarre behaviors, had normal affective expression, had coherent, logical, and relevant speech, was amicable, cooperative, and polite, and was somewhat nervous, but became more at-ease as the interview progressed. (R. at 144 – 55). It was noted that Plaintiff began to feel depressed around 2000/2001. (R. at 144 – 55). She started having panic attacks as far back as 1995/1996. (R. at 144 – 55). She had a period of excessive alcohol use during 2005/2006. (R. at 144 – 55). Plaintiff claimed that she could not pinpoint the cause of her panic attacks or any clear triggers. (R. at 144 – 55). She reported that she formerly drank to self-medicate. (R. at 144 – 55).

Plaintiff complained to Dr. Seilhamer about pervasive sadness, crying spells, disrupted sleep, diminished appetite, low energy and motivation, poor concentration, and loss of interest in former hobbies. (R. at 144 – 55). Plaintiff also described experiencing manic episodes involving racing thoughts and impulsivity. (R. at 144 – 55). Plaintiff often had panic attacks when leaving

home, had trouble being in public places with other people, and had a fear of driving at night or during inclement weather. (R. at 144 – 55).

Dr. Seilhamer indicated that Plaintiff had once been involuntarily committed at Western Psych, but had no other psychologically-related hospitalizations. (R. at 144 – 55). Plaintiff was regularly prescribed anti-anxiety and anti-depression medications. (R. at 144 – 55). Dr. Seilhamer noted Dr. Olbrich's opinion that Plaintiff suffered from depression, anxiety, agoraphobia with panic, and bipolar tendencies, as well as his opinion that Plaintiff was incapable of working. (R. at 144 – 55).

Dr. Seilhamer did not observe any cognitive disorder, and felt that Plaintiff was capable of abstract thought. (R. at 144 – 55). Plaintiff demonstrated average intelligence and generally intact memory. (R. at 144 – 55). Plaintiff showed a loss of concentration during immediate retention and recall exercises, performing less than the median of adults her age. (R. at 144 – 55). Dr. Seilhamer's prognosis was guarded. (R. at 144 – 55).

State agency evaluator Manella Link, Ph.D. completed a mental residual functional capacity assessment ("RFC") of Plaintiff on July 23, 2008. (R. at 156 – 59). Dr. Link diagnosed affected disorders, anxiety-related disorders, and substance addiction disorders. (R. at 156 – 59). Plaintiff was found to be only moderately to not significantly limited in all areas of functioning. (R. at 156 – 59). Dr. Link concluded that Plaintiff was capable of engaging in full-time work, stating that Plaintiff had been sufficiently maintained on medication by her primary care physician, that she did not see mental health specialists, she drove, and she had a social network. (R. at 156 – 59). Dr. Link opined that Dr. Seilhamer overestimated the degree of Plaintiff's functional limitations. (R. at 156 – 59).

Plaintiff returned to Dr. Olbrich for treatment in October 2008. (R. at 203 – 04). At that time, Plaintiff was being seen for suture removal following a surgical procedure. (R. at 203 – 04). Dr. Olbrich did note Plaintiff's ongoing anxiety and use of alcohol. (R. at 203 – 04).

Plaintiff was not seen again by Dr. Olbrich until July 2009, at which point he noted worsening depression and anxiety. (R. at 200). He continued Plaintiff on her prescription medications. (R. at 200). In September 2009, Plaintiff's depression and agoraphobia were noted to be somewhat stable on medication. (R. at 197). She was continued on her prescription medications. (R. at 197).

In early October 2009, Dr. Olbrich noted that Plaintiff's anxiety and depression were still stable on medication. (R. at 193 – 94). However, by the end of the month, Plaintiff complained of being stressed and unable to leave her house due to her agoraphobia. (R. at 189 – 90). Plaintiff was reluctant to see another doctor or mental health specialist, and did not want to take additional medication for treatment. (R. at 189 – 90). Otherwise, she was taking her prescribed medications. (R. at 189 – 90). Her complaints remained unchanged in November 2009. (R. at 185 – 86).

On January 6, 2010, Dr. Olbrich completed a Mental Residual Functional Capacity Questionnaire. (R. at 175 – 78). On the form, Dr. Olbrich listed bipolar disorder and agoraphobia as Plaintiff's primary diagnoses. (R. at 175 – 78). Plaintiff was noted to be taking a number of prescription medications for treatment. (R. at 175 – 78). He stated that Plaintiff suffered from poor concentration and memory loss as a result of her disorders. (R. at 175 – 78). His prognosis was "poor." (R. at 175 – 78). Plaintiff was no longer abusing alcohol. (R. at 175 – 78).

However, she would have no useful ability to function or would be unable to meet competitive standards with respect to: remembering work-like procedures, maintaining attention for two hours, maintaining regular attendance and punctuality within customary/strict tolerances, sustaining an ordinary routine without special supervision, working in coordination with or proximity to others, making simple work-related decisions, completing a normal workday or work week without interruptions from psychologically based symptoms, performing at a consistent pace without an unreasonable number and length of rest periods, dealing with normal work stress, being aware of hazards and taking appropriate precautions, understanding and remembering detailed instructions, carrying out detailed instructions, setting realistic goals or making plans independently of others, dealing with stress of semiskilled and skilled work, interacting appropriately with the general public, adhering to basic standards of neatness and cleanliness, traveling in unfamiliar places, and using public transportation. (R. at 175 – 78). Plaintiff would miss four or more days of work per month, and she would not be able to manage benefits in her own best interest. (R. at 175 – 78).

In a January 6, 2010 treatment note, Dr. Olbrich stated that Plaintiff's home life was chaotic, her finances were in desperate shape, she was involved in some sort of legal matter, and that she was very stressed. (R. at 179 – 80). He also stated that despite her issues, Plaintiff was "actually doing pretty good and holding it together pretty well today." (R. at 179 – 80). However, Dr. Olbrich ultimately concluded that Plaintiff was incapable of working. (R. at 179 – 80).

## IV. STANDARD OF REVIEW

To be eligible for social security benefits under the Act, a claimant must demonstrate to the Commissioner that he or she cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least twelve months. 42 U.S.C. §423(d)(1)(A); *Brewster v. Heckler,* 786 F.2d 581, 583 (3d Cir. 1986). When reviewing a claim, the Commissioner must utilize a five-step sequential analysis to evaluate whether a claimant has met the requirements for disability. 20 C.F.R. §§ 404.1520, 416.920.

The Commissioner must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or a combination of impairments that is severe; (3) whether the medical evidence of the claimant's impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., Pt. 404, Subpt. P, App'x 1; (4) whether the claimant's impairments prevent him from performing his past relevant work; and (5) if the claimant is incapable of performing his past relevant work, whether he can perform any other work which exists in the national economy. 20 C.F.R. §404.1520(a)(4); *see Barnhart v. Thomas,* 540 U.S. 20, 24-25 (2003). If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner (Step 5) to prove that, given claimant's mental or physical limitations, age, education, and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. *Doak v. Heckler,* 790 F.2d 26, 28 (3d Cir. 1986).

Judicial review of the Commissioner's final decisions on disability claims is provided by statute. 42 U.S.C. §§ 405(g)[2] and 1383(c)(3)[3]. Section 405(g) permits a district court to review

---

[2]   Section 405(g) provides in pertinent part:

the transcripts and records upon which a determination of the Commissioner is based; the court will review the record as a whole. *See* 5 U.S.C. §706. The district court must then determine whether substantial evidence existed in the record to support the Commissioner's findings of fact. *Burns v. Barnhart,* 312 F.3d 113, 118 (3d Cir. 2002).

Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate" to support a conclusion. *Ventura v. Shalala,* 55 F.3d 900, 901 (3d Cir. 1995) (quoting *Richardson v. Perales,* 402 U.S. 389, 401 (1971)). If the Commissioner's findings of fact are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); *Richardson,* 402 U.S. at 390. When considering a case, a district court cannot conduct a *de novo* review of the Commissioner's decision nor re-weigh the evidence of record; the court can only judge the propriety of the decision in reference to the grounds invoked by the Commissioner when the decision was rendered. *Palmer v. Apfel,* 995 F. Supp. 549, 552 (E.D. Pa. 1998); *S.E.C. v. Chenery Corp.,* 332 U.S. 194, 196 – 97 (1947). The court will not affirm a determination by substituting what it considers to be a proper basis. *Chenery,* 332 U.S. at 196 – 97. Further, "even where this court acting *de novo* might have reached a different conclusion . . . so long as the agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable

---

> Any individual, after any final decision of the [Commissioner] made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action ... brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business

42 U.S.C. § 405(g).

[3] Section 1383(c)(3) provides in pertinent part:
> The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title.

42 U.S.C. § 1383(c)(3).

10

regulatory interpretations that an agency manifests in the course of making such findings." *Monsour Medical Center v. Heckler*, 806 F.2d 1185, 90-91 (3d. Cir. 1986).

V. DISCUSSION

The ALJ concluded that Plaintiff had medically determinable severe impairments in the way of bipolar disorder, panic disorder with agoraphobia, and alcohol dependence, in remission. (R. at 14). It was determined that Plaintiff was not disabled because she had the functional capacity to perform a full range of work at all exertional levels, but limited to unskilled, simple, and routine work at a non-production rate pace that entailed little or no changes in the work setting and limited contact with the general public, co-workers, and supervisors. (R. at 16). As per the testimony of the vocational expert, a significant number of jobs existed in the national economy which could be performed by a person with Plaintiff's limitations. (R. at 20 – 21).

Plaintiff objects to the determination by the ALJ, arguing that he erred in failing to accord Dr. Olbrich's findings great weight, in failing to accord great weight to the findings of Dr. Seilhamer, and in failing to properly weigh the evidence as a whole. (ECF No. 9 at 4, 7, 10). Defendant counters that the ALJ provided substantial evidence to support his claim, specifically alleging that Dr. Olbrich's findings were not entitled to significant weight, that Dr. Seilhamer's opinion was considered and her findings fully accommodated in Plaintiff's RFC assessment, and that the ALJ discussed the totality of the evidence thoroughly. (ECF No. 11 at 12, 18, 20).

When rendering a decision, an ALJ must provide sufficient explanation of his or her final determination to provide a reviewing court with the benefit of the factual basis underlying the ultimate disability finding. *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981) (citing *S.E.C. v. Chenery Corp.*, 318 U.S. 80, 94 (1943)). The ALJ need only discuss the most pertinent, relevant

evidence bearing upon a claimant's disability status, but must provide sufficient discussion to allow the court to determine whether any rejection of potentially pertinent, relevant evidence was proper. *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 203 – 04 (3d Cir. 2008) (citing *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 121 (3d Cir. 2000); *Cotter*, 642 F.2d at 706). In the present case, the ALJ did not meet his responsibilities under the law.

With respect to Plaintiff's first and second arguments, the court notes that that a treating physician's opinions may be entitled to great weight – considered conclusive unless directly contradicted by evidence in a claimant's medical record – particularly where the physician's findings are based upon "continuing observation of the patient's condition over a prolonged period of time." *Brownawell v. Comm'r of Soc. Sec.*, 554 F.3d 352, 355 (3d Cir. 2008) (quoting *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000)); *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999) (citing *Rocco v. Heckler* 826 F.2d 1348, 1350 (3d Cir. 1987)). However, a showing of contradictory evidence and an accompanying explanation will allow an ALJ to reject a treating physician's opinion outright, or accord it less weight. *Id.*

While it is not expected that the ALJ's explanation match the rigor of "medical or scientific analysis" a medical professional might provide in justifying his or her decisions, it is expected that when rejecting a treating physician's findings or according such findings less weight, the ALJ will be as "comprehensive and analytical as feasible," and provide the factual foundation for his decision and the specific findings that were rejected. *Cotter*, 642 F.2d at 705. The explanation should allow a reviewing court the ability to determine if "significant probative evidence was not credited or simply ignored." *Fargnoli*, 247 F.3d at 42. The ALJ "cannot reject evidence for no reason or for the wrong reason." *Morales v. Apfel*, 255 F.3d 310, 317 (3d Cir. 2000) (citing *Mason v. Shalala*, 994 F.2d 1058, 1066 (3d Cir. 1993)).

Despite a relatively thorough review of the factual record, the ALJ failed to *discuss* Dr. Olbrich and Dr. Seilhamer's opinions at any length. (R. at 16 – 19). Both of these medical sources examined Plaintiff, and Dr. Olbrick had an established treatment history. The ALJ relied upon Dr. Link's assessment as support for the conclusion that Plaintiff could work, but did so without explicitly stating why the more severe findings of Drs. Olbrick and Seilhamer were essentially discarded. (R. at 19). As a result, this court will not find that substantial evidence supported the ALJ's decision. To find otherwise "approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'" *Stewart v. Sec'y of Health, Educ. and Welfare*, 714 F. 2d 287, 290 (3d Cir. 1983) (quoting *Arnold v. Sec'y of Health, Educ. and Welfare*, 567 F. 2d 258, 259 (4th Cir. 1977)). The ALJ must provide the court with his specific rationale for rejecting the above medical opinions. Consequently, with respect to Plaintiff's final argument, the court finds that the ALJ did not properly weigh all of the evidence on record[4].

## VI. CONCLUSION

Based upon the foregoing, the court does not find that substantial evidence supported the determination by the ALJ. "On remand, the ALJ shall fully develop the record and explain [his or her] findings... to ensure that the parties have an opportunity to be heard on the remanded issues and prevent *post hoc* rationalization" by the ALJ. *Thomas v. Comm'r of Soc. Sec.*, 625 F.3d 798, 800 – 01 (3d Cir. 2010). *See also Ambrosini v. Astrue*, 727 F. Supp. 2d 414, 432 (W.D. Pa. 2010). Testimony need not be taken, but the parties should be permitted input via submissions to the ALJ. *Id.* at 801 n. 2.

---

[4] The court notes – as did Defendant in his brief – that there was no record of a "Dr. Detore" having treated Plaintiff. (ECF No. 11 at 22). That portion of Plaintiff's brief basing the demand for reversal/remand upon findings by Dr. Detore was, therefore, disregarded. (ECF No. 9 at 8).

Accordingly, Plaintiff's Motion for Summary Judgment will be granted, to the extent that she seeks remand for reconsideration of the discussed issues, and denied, to the extent she seeks reversal and an immediate award of benefits; Defendant's Motion for Summary Judgment will be denied; and, the decision of the ALJ will be vacated and the case remanded for reconsideration not inconsistent with this opinion.

An appropriate Order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SHERYL MANOS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Civil Action No. 11-1147 |
| v. ) | |
| ) | Chief Judge Gary L. Lancaster |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of Social Security, ) | Electronic Filing |
| ) | |
| Defendant. ) | |

## ORDER

AND NOW, this **11** day of May, 2012, IT IS HEREBY ORDERED that Plaintiff's Motion for Summary Judgment [document #8] is GRANTED, in part, and DENIED, in part, and Defendant's Motion for Summary Judgment [document #10] is DENIED. The decision of the ALJ is hereby vacated and this case is remanded for reconsideration not inconsistent with the foregoing opinion.

_____,C.J.
Hon. Gary L. Lancaster
Chief United States District Judge


cc/ecf: Kelie C. Schneider, Esq.
   Robert Pierce & Associates, P.C.
   707 Grant Street, 2500 Gulf Tower
   Pittsburgh, PA 15219

   Albert Schollaert, Esq.
   United States Attorney's Office
   700 Grant Street
   Suite 4000
   Pittsburgh, PA 15219

15